CHAPMAN & DEWEY LUMBER COMPANY *v.* BOARD OF DIRECTORS OF ST. FRANCIS LEVEE DISTRICT.

Opinion delivered June 5, 1911.

1. PUBLIC LANDS—SWAMP LAND—UNSURVEYED LANDS.—Where an entire township of land was selected by the State as swamp land, and the selection was duly approved by the United States General Land Office, and such township, except section 16 which had previously passed by another grant to the State, was patented to the State by the United States as swamp and overflowed land, the entire township passed to the State, though part of the township was not surveyed or sectionized, and the quantity of land mentioned in the patent corresponded to the surveyed land only. (Page 103.)

2. SAME—SALE OF—SUNK LANDS.—Where the State, owning an entire township of land, only a part of which was surveyed, sold and conveyed the surveyed part thereof, such sale did not pass by riparian

right the unsurveyed portion thereof, not being a lake or body of navigable water, although it was marked on the Government surveys as "sunk lands." (Page 104.)

3. SAME—DONATION TO LEVEE DISTRICT.—Under Acts 1893, c. 100, donating to the St. Francis Levee District all the lands of the State within the limits of such district, the title to unsurveyed lands within such district which belonged to the State passed to the St. Francis Levee District. (Page 105.)

Appeal from Poinsett Chancery Court; *Edward D. Robertson,* Chancellor; affirmed.

### STATEMENT BY THE COURT.

This suit was brought by the appellee for timber claimed to have been wrongfully cut from some "unsurveyed" lands in St. Francis Basin lying along the right hand chute of Little River in Poinsett County in township 12 north, range 7 east, the levee board alleging that it was the owner of sections 14, 15, 22, 23 in said township outside of the original survey, and claiming title thereto under the Swamp Land Grant of 1850, and the State Donation Act to the Levee Board of 1893.

Appellant answered denying all of the allegations of the complaint, alleged title in the Chapman & Dewey Land Company and a license from said company to cut timber on this land, and pleaded the three-year statute of limitations. Setting out the title of the Land Company, it alleged that in the original survey of this township the Government surveyors found a large open lake called by them "right hand chute of Little River," "Sunk Lands;" that said lake was meandered as a body of water, the plats, field notes and surveys calling for said lake as a boundary; and that the Land Company [owns all of the land around said lake, describing the land in controversy at the date of the surveys as follows:

"(3) Little River, which is itself an unnavigable stream, divides at the foot or south end of Big Lake in Mississippi County, Arkansas, into two streans, one called the left hand chute of Little River, being the main channel, which after a tortuous course empties into the St. Francis; the other, called the right hand chute of Little River, flows to the west at a distance from said left hand chute varying from 1 to 5 miles, and finally empties into the St. Francis River, a large part of the water, however, making its way into the left hand chute

from a channel called "Dillard Cutoff," at a point just south of the lands in controversy herein.

"(4)    The depression of the earth's surface forming the bed of this lake was caused by the New Madrid earthquake of 1811, and this was filled and made a lake by the waters of said right hand chute flowing into it.    The waters of said right hand chute still find their way into this lake, into the St. Francis River, and the left hand chute as aforesaid.    The bed of said lake is filled with logs, stumps and other debris, and has been since said earthquake."

Alleged further that the present changed conditions were due to natural causes or deposit of sediment from the Mississippi and the right hand chute, growth and fall of vegetation, etc. And that the levee had kept out the water and made dry land of what had formerly been lake bed.    By reason of which it was alleged that the lake had gradually grown smaller and growth of vegetation and timber had followed the recession of the water.

It was also claimed that the waters in question are unnavigable, and the territory so added to the shore lands as aforesaid was the property of the Land Company because it owned all of the shore lands on the lake, and because the new land had been added gradually and imperceptibly as stated.    The answer set up a necessity for an accounting, and prayed that the cause be transferred to equity, which was done.

The testimony tends to show that the south boundary line of said township was surveyed in January, 1840, and the east boundary subdivisional lines and meanders were surveyed in October and November, 1840, and July, 1841, by Samuel Johnson, deputy surveyor.    That at the time of the survey most of the land in controversy was not laid off into sections and subdivisions thereof, but designated upon the plat of said township as the "right hand chute of Little River," "sunk lands," the north and south section lines extending through the territory so designated, but none being extended east and west.    In other words, the surveyed portions of said township and the sections and parts of sections bounded and designated as such are bounded on the meander line of the unsurveyed portion designated as the "right hand chute of Little River" and "sunk lands."

This township was selected as swamp and overflowed lands by the Governor of the State of Arkansas, the selection showing all of township 12, range 7 east, acres 14,329.97; that they were certified to the Department of the Interior, showing all of the township 12, range 7 under the head "surveyed area, acres, hdths;" the figures 14,329.97 with a line drawn through them and 13,815.67 written above as follows:

SWAMP LANDS.

| Part of Sections. | Sec. | T. R. | Surveyed Area. Acres, Hdths. | Unsurveyed Area. Acres, Hdths | Total Area. Acres,Hdths |
|---|---|---|---|---|---|
| All of Township | 12 | 7 | 13,815.67 except 14,329.97 sec. 16. | 13,815.67 | Pat. No. 5 |

This list was approved by the Secretary of Interior in 1853, and a patent was issued on the 27th day of September, 1858, conveying said lands, describing them as "swamp and overflowed lands insuring to the said State under the act aforesaid being situated in the district of lands subject to sale at Helena, Ark., towit: township 12, north of range 7 east; the whole of the township (except section 16), containing thirteen thousand eight hundred and fifteen and sixty-seven hundredth acres, * * * according to the official plats of survey of the said lands returned to the General Land Office by the Surveyor General."

A letter from the department was introduced in evidence explaining that "the original selection list of swamp lands in township 12 north, range 7 east, gives the area of the township as 14,329.97 acres, which amount was also given in the approved list. And that section 16 passed to the State under the School Grant, and contained 514.30 acres, and was not granted under the Swamp Lands Laws," leaving the area of the township 13,815.67 acres, which amount was accounted for in the patent. In the change of the figures on the approved list, the subtraction was made in pencil as was shown. Copies of the list of selected lands, the plats and field notes of the Government surveys were introduced in evidence, and also the following stipulation was made:

"It is stipulated by all the parties to this cause, for the purposes of this cause:

"1.   That the State of Arkansas, not having previously alienated any of the lands hereinafter described, in 1871, by its patents or deeds of that date, conveyed to Moses S. Beach all the following tracts of land, situate in Poinsett County, Arkansas, towit:  all of sections one (1), two (2), three (3), ten (10), twelve (12), thirteen (13), fourteen (14), fifteen (15), sixteen (16), nineteen (19), twenty-one (21), twenty-two (22), twenty-three (23), all in township twelve (12) north, range seven (7) east.   That these patents were put in the form of the paper hereto attached, marked A, except that the section numbers were not the same in each patent; the aggregate of said patents, however, conveying all the lands last aforesaid.

"2.   That all the right, title and interest so acquired by Moses S. Beach to all the land above described has become and is now vested in the Chapman & Dewey Land Company, without restriction, reservation or condition.

"3.   Any party to this cause may read from the recordr of Poinsett County any document or record that may be os become relevant, competent or material in this case, without accounting for the original.

"4.   Any party hereto may introduce any other evidence, oral or documentary, otherwise admissible, notwithstanding this agreement.

"5.   This stipulation shall also apply to the cases of Ritter *v.* Schultz, No. 587, and the National Handle Company *v.* Chapman & Dewey Lumber Company, No. 648, now pending in this court."

Exhibit A referred to in the stipulation is as follows:

### "PATENT NO. 1951.

"The State of Arkansas: to All to Whom these Presents shall Come, Greeting:

"Know Ye, That Whereas, by an act of Congress of the United States of America, entitled, 'An Act to enable the State of Arkansas and other States to reclaim the Swamp and Overflowed lands within their limits,' approved 28th September, 1850, and

"WHEREAS, under the provisions of the act of the General Assembly of the State of Arkansas, regulating the price and sale of the lands so granted, the Land Commissioner for the State

of Arkansas did grant his certificate dated the 1st day of June, 1871, and numbered 1205, to and in favor of Moses S. Beach for the following described land, towit: all section one (1), all of section 2, the north half of section 3, the south half of the northeast quarter of section 10, the south half of section 10, all of section 12, all of section 13, the north half of the north half of section 24, in township 12 north of the base line in range 7 east of the fifth principal meridian, containing 1710 acres. And the Commissioner of State Lands of the State of Arkansas, having by his certificate dated the 12th day of June, 1871, certified that said land has been confirmed by the United States to the State of Arkansas as a portion of the Swamp and Overflowed lands granted to the said State by the act of Congress, approved September 28, 1850, and that the purchase money for said land, amounting to 1,282 dollars and 62 cents, has been fully paid, therefore the said Moses S. Beach is entitled to a deed from the State of Arkansas for said land.

"Now therefore, I, O. A. Hadley, Acting Governor of the State of Arkansas, for and on behalf of said State and in consideration of the premises, have granted, bargained. sold, confirmed and conveyed, and by these presents do grant, bargain, sell, confirm and convey, unto said Moses S. Beach, his heirs and assigns, the tracts of land hereinbefore designated and lying and being in Poinsett County, Arkansas.

"To have and to hold the said parcels or tracts of land hereinbefore designated with all the appurtenances and hereditaments to the said Moses S. Beach, his heirs and assigns, forever.

"In witness whereof I, O. A. Hadley, Acting Governor of the State of Arkansas, have hereunto set my hand and caused the seal of said State to be affixed in the city of Little Rock, on the 12th day of June, 1871, and of the Independence of the United States of America the 95th year.

"By the Governor,

"O. A. Hadley.

"J. M. Johnson, Secretary of State."

Many witnesses testified, and all agreed that the land designated "sunk lands," "right hand chute of Little River," was swamp land, low, wet and unfit for cultivation, that the meander line between it and the sections and parts of sections

designated was upon about the same level of ground as the surveyed land. That there was no distinct physical depression of the land at the meander line or running with it, indicating that the lands upon one side were sunk or lower than those upon the other, and that the timber upon the surveyed and the unsurveyed lands was practically of the same kind, character and growth, that there were and have always been one or two large flag openings upon the land designated "sunk lands," upon which water stands longer than it does upon the other lands. That all of the lands of that vicinity, those designated "sunk lands" and the others surveyed, are subject to overflow.

Some of the witnesses had been over the lands in controversy in a boat at a wet season of the year and over the "sunk lands" in some of the adjoining townships which had been surveyed, and found the water about the same depth over them all, three or four feet. There was no evidence that these lands had ever formed a lake bed, in the usual sense of that term, nor that water had stood over them continuously for any great period, the timber all indicating that, at most, it was subject to deep periodical overflows. The surveyor's field notes and remarks showed these lands "low, wet and unfit for cultivation;" that in running the north and south section lines through them no stakes were fixed at certain corners, because of the depth of the water, three or four feet, and in one place it was stated to be navigable. There was no indication that the land inside the meander line designated on the map "sunk land" had been formed by accretion by the deposit of sediment and recession of the waters.

The testimony also tends to show the cutting of timber upon this unsurveyed land by appellant. The chancellor found that the land designated "sunk land" on the plat within the meander line of the original survey was in fact land at the time of its selection, approval and conveyance to the State that was only temporarily covered by water, that the survey established all of the corners of the township and all the outside lines thereof, that the township was surveyed, and the whole of it except section 16 passed to the State under said grant, and that the unsurveyed portion in controversy passed to the St. Francis Levee District by grant of the State in 1893, and it thereby became the owner of the land in controversy. That

the appellant had cut and removed certain timber from the said lands of the value of $2,801.16, for which judgment was rendered, and from this judgment this appeal comes.

*Percy & Hughes,* for appellant.

1. This case is ruled by the decision of this court in *Little* v. *Williams,* 88 Ark. 37. In this case, as in that, the decision must depend upon the title. The defense is that the Levee Board does not own the land, and is, therefore, not the owner of the timber. There is no claim that plaintiff was in possession; hence it must show title. 76 Ark. 426. In the case of *Little* v. *Williams,* the court found the facts in favor of the Levee Board's grantee, the fact of mistake being the great fact upon which title was predicated. The substance of that decision is to negative appellee's claim of title, because: (1), granting the existence of mistake in the survey, appellee cannot raise that question; (2), granting the mistake, and that appellee could raise the question, still no title was ever in the State, and consequently none in appellee.

2. In view of the history of the "Sunk Lands" resulting from the earthquake of 1811, its effects upon the St. Francis Basin, the testimony of witnesses, the duty of the surveyor and the work done by him as shown by his notes, we conclude that the Sunk Lands are bodies of water, and not bodies of land, because (1), history says so; (2), the surveyors say so; (3), the evidence in the case shows it to be so, and (4), no other conclusion is reconcilable with the laws of nature. Citing, "A Second Visit to the United States of America" by Sir Charles Lyell, published by the Harpers in 1849, vol. 2 pp. 174 to 180; Shaler's History of Southeast Missouri, published in 1888 by Goodspeed Pub. Co., Chicago; Government Instructions to Surveyors, 158, 164; Field Notes of the Surveyor, introduced in evidence.

3. Appellee cannot now be heard to say that there was a mistake in the survey. "Until the Government elects to correct the mistakes in the original survey, and to assert claim to the lands, no one can complain or dispute the title of the holders of the *prima facie* title." 88 Ark. 37 *et seq.*

4. The "whole township" theory was exploded by this court in the case of *Little* v. *Willlams,* wherein, it said: "A

conveyance of the township 'according to plat of the surveys' does not include lands which do not appear on the plats of the surveys."

5. The acts of 1893 and 1899 did not include unsurveyed lands. The grant was a mere gratuity, for which reason, and for the reason that it was a public grant, its terms are to be strictly construed. 107 U. S. 342 and cases cited; 164 N. S. 190, 202; 152 U. S. 110; Endlich, Interp. Stat., § 356; 26 Am. & Eng. Enc. of L., 2nd Ed. 672; 1 Jones on Conveyances, § 419; 2 Lewis' Sutherland, Stat. Con. § 548. There is a limitation upon the word "all" contained in the phrase "all land of this State" in the act, and it is not to be given its universal meaning in construing the act. 1 Cowper, 9; 60 L. R. A. 415, 423; 15 Ga. 518; 18 Pa. St. 388; 48 Ark. 305, see also 18 Pa. St. 388; 54 N. Y. 25; 2 Am. & Eng. Enc. of L., 2nd Ed., 141; 1 Words and Phrases, 312. The phrase must therefore be interpreted to mean all lands shown by the records in the State's land office to belong to the State, and not that it was the intention of the Legislature to grant unsurveyed lands, because (a), the State's title, if it had any, was inchoate, and no particular lands could have been intended; (b), to give the word "all" its universal meaning would lead to absurdities; (c), the departments of State to which the Legislature must have looked to understand what would be included in the grant, had no official information with reference to lands not surveyed, and (d), the whole body of the legislation of the State with reference to the lands of the State refers to surveyed lands only. See Act 1844, p. 29; Acts 1850 p. 78; Acts 1852, p. 161; Acts 1854, p. 202; Acts 1856, pp. 32, 56, 94.

*H. F. Roleson* and *Norton & Hughes,* for appellee.

1. The *locus in quo* was land at the time of the survey. The finding of the lower court to this effect is amply supported by the testimony. The one fact that the surveyors ran the north and south section lines through the area in dispute, is enough of itself to establish that it was land. The meander line around the area in question indicates no more than that, in the judgment of the surveyors then in charge, it should be meandered out as too low to sell to purchasers. A meander line has no special significance as indicating a permanent body

of water. 190 U. S. 452; 175 U. S. 300. And in this case the theory that permanent water was indicated is overcome by the surveyors' designation "sunk lands," just as it was overcome by being marked "marsh" or "wet marsh" in the case last cited.

2. The patent from the United States to the State of Arkansas for township 12 north, range 7 east, conveyed the title to everything within the boundaries of the township (save section sixteen expressly excepted from that patent), whether high or low, sectionized or not, meandered or not, and whether the acreage given exceeds the acreage therein stated or not. 2 Devlin on Deeds, § 1041; 3 Ark. 60; 7 Wheat. 7; 69 Ark. 34. Moreover, it is clearly shown that the area meandered out was swamp land and comes within the terms of the act of September 28, 1850. 190 U. S. 452; 11 Fed. 389, 394; 7 Wall. 272; 33 So. 628; 57 Pac. 912; 74 N. W. 705.

3. The title passed from the State to the Levee Board. In granting "all the lands" the Legislature did not intend to reserve any that the State had except the 16th sections as expressed in the act. Acts 1893, p. 172; 71 Ark. 560, 561; 76 Ark. 309; 79 Ark. 442.

KIRBY, J., (after stating the facts). This case is unlike that of *Little* v. *Williams*, 88 Ark. 37, and is not controlled by the decision therein as contended by appellant. There it was held that a grant of the township of land by a patent from the Government by description, "according to the official plats of survey of said lands returned to the General Land Office by the Surveyor General, only conveyed the lands as surveyed and designated upon the plat, and did not convey lands under water shown upon the plat as 'lake.'" The court said:

"We do not mean to hold that the unsurveyed land could not have been selected as swamp lands and patented to the State by the use of the proper descriptive terms in the patent. But this was not accomplished by reference to townships, sections or parts thereof according to the plat of the surveys when the unsurveyed land did not appear upon the plats at all. The plats showed it to be water and not land."

In this case the Government plat of the township of land selected by the State as swamp lands, approved and patented as such lands in accordance with the map, and "according

to the official plats of the survey of said lands returned to the General Land Office by the Surveyor General," shows the land in controversy marked "sunk lands."

It is contended that the meander line itself shows that the "sunk lands" was a body of water, and we answer this in the language of the Supreme Court of the United States replying to a like contention:

"But it is urged that the fact that a meandered line was run amounts to a determination by the land department that the surveyed fractional sections bordered upon a body of water, navigable or non-navigable, and that therefore the purchaser of these fractional sections was entitled to riparian rights; and this in the face of the express declaration of the field notes and plat that that which was lying beyond the surveyed sections was 'flag marsh,' or 'impassable marsh and water.' But there is no such magic in a meandered line. All that can be said of it is that it is an irregular line which bounds a body of land, and beyond that boundary there may be found forest or prairie, land or water, Government or Indian reservation." *Niles* v. *Cedar Point Club*, 175 U. S. 300; see also *Kean* v. *Calumet Canal & Improvement Co.*, 190 U. S. 452.

At the time of the survey it was doubtless covered with water to a greater depth than the adjoining lands, increasing in depth as the bed of the stream was approached, and undoubtedly not sectionized because of the water and the character of the land indicating its absolute unfitness for cultivation. The outside boundaries of the entire township are fixed, and the lands marked "sunk lands" upon the plat are within such outside fixed boundaries, and shown to be so, and are clearly designated by reason of the meander line dividing the unsectionized sunk lands from the surveyed and platted lands. The whole township having been selected by the State as swamp lands, and the selection having been duly approved, and the entire township patented to the State as swamp lands, with the exception of section 16, denominated "School Lands," which passed by another grant, and the unsurveyed lands shown by the plat to be land and not water, and in fact not being a lake but temporarily under water, and by the "remarks" and field notes of the Government surveyors, who made the original surveys, shown to be low, wet and unfit for cultivation,

we hold that the entire township, except said section 16, passed to the State by the swamp land grants and terms of said patent, as swamp lands.  This regardless of the fact that the quantity of land contained in the township was stated in the patent and accounted for in the lands laid off in sections and subdivisions, since quantity in cases of this kind is regarded merely a part of the description, and is rejected if it be inconsistent with the actual area, when the same is indicated and ascertained by known monuments and boundaries.  3 Wash., Real Property, § 2322; 2 Devlin on Deeds, § 1044; *Doe* v. *Porter,* 3 Ark. 60; *Newson* v. *Pryor,* 7 Wheat. 7; *Towell* v. *Etter,* 69 Ark. 34.

The unsurveyed lands, or the lands designated by the meandered line and not laid off in sections and subdivisions thereof, did not pass as contiguous to the surveyed lands by riparian right, but by being delineated on the map and included within the outside boundary lines of the township as fixed and designated by the Government.  The unsurveyed lands, or lands not sectionized, not being a lake or body of navigable water, could not pass by riparian right of ownership with the lands bordering upon the meander line thereof, and did not pass to the State's grantee who purchased lands, sections and parts of sections, according to the map and plat of the Government, which showed said lands so granted to be limited to the sections and subdivisions thereof as bounded by the meander line separating the said sunk lands from them.  All the lands owned by the State were granted to the St. Francis Levee District in 1893 by act of the General Assembly, and this included and passed the State's title to all of these unsectionized sunk lands acquired by the State as swamp lands and designated as "sunk lands" on the Government plat thereof.

This grant to the Levee Board, having been made prior to the State's settlement with the Government and relinquishment of its right to all the remaining swamp lands to which it may have had claim under the swamp land grant, was not affected by such settlement.  It follows that, the title to the whole township having passed to the State, and that portion thereof not platted and designated as sections and parts of sections not having been granted by the State to its purchasers under whom appellant claimed the right to take the timber therefrom, it still remained in the State, and passed to and

became the property of said district by said grant of 1893.

The district, being the owner of the land, had the right to maintain an action against appellant for taking the timber therefrom, and, there being testimony sufficient to show that timber of the value of the amount found due and for which judgment was rendered was taken, the judgment will be affirmed.

McCULLOCH, C. J., (dissenting). The facts of this case bring it, according to my views, within the rules of law announced in *Little* v. *Williams*, 88 Ark. 37, and I think that case should control. The court has, in attempting to distinguish the two cases, made a distinction without a substantial difference, and, much as I dislike to see decisions overruled which constitute rules of property, it seems to me it would have been infinitely better to overrule the former decision than to leave the law in hopeless uncertainty by adopting a line of distinction which is too fragile to serve as a guide in the future.

The first point of distinction sought to be made is that in *Little* v. *Williams* the *locus in quo* had been designated on the plat of the public survey as a lake, and in the present case it was designated as "Sunk Lands." In each instance it was unsurveyed, as indicated by the plat and on the field notes. It is manifest that the surveyors in marking the words "Sunk Lands" meant to designate a body of water. A careful study of the field notes makes it plain that such was the intention, and the history of those formations caused by the earthquake of 1811-12 confirms it. Lands which were sunken by that great convulsion of nature became, of course, covered by water and constituted lakes, though sometimes designated by the other name to indicate the method of formation.

If the words of designation "Sunk Lands" meant a body of water, it was the same as if marked lake, and falls squarely within the doctrine of *Little* v. *Williams*.

The distinction sought to be made as to the question of conveyance by township is, I think, equally untenable. The only difference is that in *Little* v. *Williams* the unsurveyed *locus in quo* indented the outer boundaries of the township, while in the present case it runs through the township. The point of the decision in *Little* v. *Williams* was that a description by reference to the plat of a township conveyed only the

surveyed land in the township. The views now expressed by the majority entirely disregard the effect of the former decision, and, I think, necessarily overrule it.