BURBRIDGE *v.* BRADLEY LUMBER COMPANY OF ARKANSAS.

4-8606, 4-8607 (consolidated)          215 S. W. 2d 710

Opinion delivered November 22, 1948.

*DuVal L. Purkins* and *U. A. Gentry,* for appellant.

*Williamson & Williamson,* for appellee.

GRIFFIN SMITH, Chief Justice. L. J. Burbridge appeals from two decrees in favor of Bradley Lumber Company in controversies testing ownership through purchase of tax titles. The actions are consolidated here for the purpose of an opinion.

September 30, 1936, Bradley named Burbridge and Howard Grider defendants in an action to restrain them from cutting and removing timber from the Southwest Quarter of the Southeast Quarter of Section Twenty-two, Township Thirteen South, Range Nine West, in Bradley County. The plaintiff also asked that its title be quieted and confirmed. The appeal is our No. 8606.

Burbridge filed suit January 15, 1937, alleging ownership of the Fractional Southeast Quarter of Section Twenty-three, Township Twelve South, Range Nine West, in Bradley County. He charged that the Lumber Company had cut and removed timber having a stumpage value of $7,500, worth $15,000 in its converted form. Judgment for the larger sum was asked, together with a decree confirming title. This appeal is our No. 8607.

*Number 8606.*—The Lumber Company, (for brevity, sometimes spoken of as Bradley) acquired title to the Southwest Quarter of the Southeast Quarter October 11, 1917. Burbridge, however, purchased the property at a sale for delinquent taxes June 8, 1908, covering 1907 taxes. A clerk's deed was issued to Burbridge August 28, 1911. After procurement of the deed, taxes were paid on the land for 1908 and 1909 by Gates Lumber Co., Bradley's predecessor in record title. Burbridge paid for 1910, and Gates met the obligations for the succeeding five years. For 1916 payment was by S. B. Meek and R. S. Jolley, the latter being grantees of Gates Lumber Co. Bradley paid for 1917 and for the three succeeding years, while Burbridge alone paid for 1921, 1922, and 1923. During the next seven years (1924 to 1930, both

inclusive) Burbridge and Bradley each paid, but in point of time Burbridge was ahead of Bradley. Taxes for 1931 and 1933 were paid by Burbridge, but the assessment for 1934 was discharged by Bradley. Bradley paid for 1935, 1936, 1937, 1938, and 1939; but Burbridge also paid for 1937. Burbridge paid for the years listed subsequent to 1939, including 1945, but Bradley duplicated the 1942 payment. The 1937 item is marked, "One-fourth of $3.46 paid by Burbridge April 21, 1938; three-fourths of $3.46 paid by Bradley Lumber Co. October 3, 1938." Because the suit was filed in September 1936, rights are referable to transactions alleged in the complaint.

By stipulation it is shown that records of the Levying Court (October 7, 1907) affirmatively disclose a vote on all taxes other than school, but a later "list," and notice of sale of delinquent lands for 1907, shows a forty-cent school tax, included in assessments for which property sold. Other irregularities alleged, and set out in the stipulation, were: (a) As advertised, the Clerk's cost was five cents; Clerk's cost for which the property actually sold, twenty-five cents. (b) The same was true in respect to Sheriff's cost. (c) The land was advertised to be sold for taxes, penalty and cost amounting to $2.28, but was actually struck off for $2.78. (d) The record of delinquent lands sold to individuals for the period in question actually totals $2.68 when the several items are added, but the sale was for $2.78—a fact disclosed by the Clerk's deed to Burbridge. (e) The list of delinquent lands and notice of sale, required by § 13,846 of Pope's Digest, was first published May 28, 1908, repeated June 4, and the sale held June 8, and the Clerk's certificate is dated June 8. (f) The land is wild and unimproved and unenclosed. It is timber land within the purview of §§ 8920 and 8921 of Pope's Digest.

After holding that Grider was an employe of Burbridge and had no interest in the subject-matter, the Court found that the Collector's sale for 1907 taxes was void, but that the Clerk's deed was color of title. It was the Special Chancellor's view that § 8920 of Pope's Digest was not available to Burbridge, because of Bradley's tax payments covering 1924 and 1930 (and intervening

years), a course of conduct by the owner which had the effect of "breaking the adverse possession." The Court asserted that a duty rests upon all property-owners to pay taxes, and in view of the privilege given by law to pay during a prescribed period, no other person had the right during that time to engage in a "race" to establish priority; hence, the fact that receipts were issued to Burbridge at a time when the property was delinquent would not be effective in discharging the tax lien—a lien, under the Court's construction, that subsisted in spite of Burbridge's payment. It was the Court's further thought that Bradley made an effort, in good faith, to pay the taxes for each of the years upon which Burbridge relies, and that the effort was "tantamount to payment."

Testimony upon which the Court relied in finding that Bradley endeavored to discharge the liens was given by Joe L. Reaves, representing the Company, and John C. Lee, who had served as Collector. Reaves said that, as to his own conduct, beginning in 1924, it had been the Company's custom to prepare a list of property upon which taxes were to be paid, and deliver it to the Collector in January or February. This list was never submitted "later than the month of February." When the list was delivered, the Company's representative was informed that receipts would be "worked up" at the Collector's convenience. The Collector, in turn, was told that the Company was ready to pay when the receipts were available. The different properties were ascertained by referring to a Land Record Book maintained by the Company, but the witness (Reaves) did not check to ascertain if any lands had formerly forfeited. No copy of the list was retained; neither did the Collector return the original when taxes were paid. So far as Reaves knew, no effort was made by the Company to determine if all taxes had been paid. There was complete reliance upon the Collector's good faith, accuracy, and sufficiency of the list. His first knowledge that the taxes had not been properly paid came when the suit was filed.

John Lee, who served as Collector during the period in question, testified that Bradley and one of the other large lumber companies in his county "favored" him by

supplying the lists mentioned by Reaves. He "guessed" the Bradley Company understood the receipts would be made out in the course of ordinary convenience, as time was found for the task. There was no request that the list be "worked up" at any particular time, although Reaves told him the Company was ready to pay at any time. When asked why (for each of the years during which Burbridge paid before Bradley) he had accepted the Company's money when someone else had paid the assessment, Lee replied, "It could have been a double assessment, [but that] is not likely."

The Lumber Company argues, first, that irrespective of the payment made by Burbridge in 1908 and his "void" Clerk's deed of 1911, payment of taxes by Bradley and its predecessors in title for the ten years subsequent to 1910 and before 1921 had the effect of investing perfect title in Bradley; and this would be true, they say, even if appellant's tax deed had been valid. *Jones* v. *Brown,* 211 Ark. 164, 199 S. W. 2d 973.

The second contention is that a presumption must attach that Gates Lumber Company redeemed the land from the 1907 forfeiture; but if this is not sufficient, then Burbridge is barred by *laches* in that for ten years he permitted Bradley and its predecessors to pay taxes, hence Burbridge must have abandoned "his void claim." *Townsend* v. *Bonner,* 205 Ark. 172, 169 S. W. 2d 125; *Mc-Farlane* v. *Morgan,* 157 Ark. 97, 248 S. W. 257. To sustain the contention that Burbridge was guilty of *laches,* attention is called to *Hay* v. *Nickey Brothers,* 142 Ark. 398, 218 S. W. 855.

The third ground relied upon (that the sale for 1907 taxes was void and could not be cured by Act 142 of 1935) involves insufficiency of publication, notice of sale having been for less than two full weeks. Other matters mentioned in the stipulation—failure to levy a school tax and inclusion of such in the exaction; excessive taxes, involving an alleged overcharge of 20 cents by the Sheriff and by the Clerk, and unexplained discrepancies between advertised total and total collected,—these are pointed to, with reliance upon such cases as *Lambert* v. *Reaves,*

194 Ark. 1109, 110 S. W. 2d 503 and 112 S. W. 2d 33; *Lumsden* v. *Erstine,* 205 Ark. 1004, 172 S. W. 2d 409, 147 A. L. R. 1132; *Carle* v. *Gehl,* 193 Ark. 1061, 104 S. W. 2d 445, and cases following the Carle-Gehl decision.

We pretermit a discussion of questions raised under the first, second, and third assignments presented to the Court below, and under which the record titleholder ,prevailed, for the reason that the Clerk's deed, even though void as appellee contends, was color of title—a fact admitted by all parties. Nor is it necessary to discuss the fourth proposition, relating to the curative effect of Act 142.

The real question is, What effect must be given to claims of right invoked by Burbridge through color of title under the deeds?

.   .   .   .   .

*Number 8607.*—Suit in this case, having been brought by Burbridge, and lost by him in the Court below, involves a finding by the Special Chancellor that a Clerk's tax deed to appellant, dated July 14, 1915, was void on its face. Other defenses are discussed.

The sale resulting in appellant's deed was held June 9, 1913, and was referable to 1912 taxes. Testimony by John Lee and Joe Reaves relating to the Company's custom of filing lists with the Collector, and practices of the Collector's office, is substantially the same as that given in Case No. 8606. Sequence of tax payments is shown in the footnote.[1]

---

[1] From 1906 until the forfeiture taken advantage of by appellant occurred, the Fractional Southeast Quarter of Section Twenty-Three was owned by Warren Vehicle Stock Company. December 31, 1912, Warren Vehicle quitclaimed to Texas Hardwood Lumber Co., and Texas Hardwood (July 10, 1916) conveyed by warranty deed to Bradley Lumber Co. Texas Hardwood paid the taxes for 1915 and 1916; and for 1917 Bradley paid on land described as "Fr. E. SE W E", the abbreviation "W.E." appearing in a separate line under "E SE". Burbridge next appears in 1918, when, according to the tax books (copy) filed as Exhibit "B" to stipulations, he received receipt No. 344 dated February 17, covering the Southeast Quarter of Section Twenty-Three, etc. The same record disclosed receipt No. 3,000 (not claimed to have been delivered) in favor of Bradley, dated April 10, 1919. Under "parts of section" there is typed "Fr. E. SE W NE", but a line has been drawn through "Fr. E. SE". No payment or acreage is indicated. For 1919 and 1920 Bradley paid (Apr. 10, 1920, and Apr. 9, 1921, respectively) on land in Section

Essential facts disclosed by the detailed statement appearing in the margin are (a) that in making its settlement with the Collector for 1921 taxes, Bradley paid on the West Half only, and the same policy was pursued in respect of payments for '22, '23, and '24; (b) that during the entire period beginning with the 1922 assessment and ending with 1932—eleven years—the Burbridge payments were prior to Bradley's; (c) Bradley did not pay any part of the Southeast Quarter for 1925 and 1926, while Burbridge paid under the description, ''R.B.R. Frl. SE¼.''

On cross-examination Reaves admitted that the Collector, on June 14, 1926, issued to the Company receipt No. 3900, pertaining to ''R.B.R. SE¼, 23-12-9, 118.02 acres,'' followed by the notation, ''Paid by L. J. Burbridge.'' The witness replied that he did not examine the receipt and had not observed that Burbridge, instead of the Lumber Company, had paid. Taxes for that year paid by Bradley were on property described as ''R.B.R. W½ SE¼ and R.B.R. E½ SE¼.''

A decree similar in essentials to that rendered in Case No. 8606 was signed, effect of which was to say that the sale in 1913 for 1912 taxes was void and that Burbridge took nothing by virtue of his 1915 Clerk's deed; that Act 142 of 1935 did not cure the defects, and that § 8920 of Pope's Digest afforded no protection.

The Chancellor said in the decree that '' . . . for the years 1924-'26, inclusive (with the possible exception of 1925) the Lumber Company, as owner of the record title, actually paid taxes upon a part of the property, and for 1927-'35, inclusive, it actually paid taxes on all

Twenty-Three described as "RBR E½ SE Both Sides River W½ E½". Beginning with taxes due for 1921, Bradley paid April 10, 1922, on the West Half East Half only. January 4, 1922, Burbridge paid the 1921 taxes on "Fr. SE¼ RBR". For 1922 Bradley paid on the West Half East Half only, the receipt being dated Apr. 10, 1923, while Burbridge (Apr. 10, 1923) paid on "Frl. SE¼ R. B. R." Burbridge paid April 10, 1924, and April 11, 1925, for '23 and '24 taxes, on "Frl. SE¼ R. B. R", and for the same years Bradley received an undated receipt covering 1923 taxes on the West Half East Half only, while on June 1, 1925, the Company paid on the West Half East Half for 1924. Taxes for 1925, '26, and '27 were paid by Burbridge January 4, 11, and 16, respectively, of '26, '27, and '28, while for 1927 Bradley paid June 11, 1928. Thereafter each paid until 1935.

of it, thus breaking the adverse possession provided for in § 8920 of Pope's Digest; and this is true even though Burbridge during these years also paid taxes on the property, and (notwithstanding the fact) that for the years 1924-'31 such yearly payment of taxes by Burbridge were made in advance of payments by Bradley. It was the duty of the Lumber Company, as the record owner, to pay the taxes on the property, and it had the right to pay these taxes for each year at any time before the day fixed by law for the sale of delinquent lands. It is not the policy of the law to require a record owner to 'race' the adverse claimant to the Collector's office in order to avoid the drastic provisions of § 8920 of Pope's Digest. Moreover, the defendant for each of the years 1924-'35, inclusive, made a good faith effort to pay the taxes not later than the month of February for each of the years.''

•  •  •  •

*Particular Lands—Sufficiency of Description.*—The grant to Bradley July 10, 1916, conveyed "all the Southeast Quarter [etc.] lying west of the Saline River." The Clerk's tax deed issued to Burbridge conveyed "The fractional Southeast quarter of Section Twenty-three in Township Twelve South, Range Nine West, containing 132 acres more or less." Appellee's evidence includes a plat showing meandering of the river, a total of 593.61 acres in Fractional Section Twenty-three, and an indicated 135.53 acres in the Fractional Southeast Quarter. By a process of deduction it is shown that in paying assessments under the description "RBR Fr. SE¼," the area could have embraced but 118.02 acres. It is conceded that "R. B. R." was "doubtless intended to mean 'right bank of river'." With this as a premise, appellee argues the description was indefinite, hence the sale was **void.**

Opposing this assertion, however, there is the long-established rule that unless the fact upon which avoidance is sought appears from the face of the deed, it *is* color of title: and, having that attribute, the provisions of § 8920 of Pope's Digest will not be defeated by a collateral showing that the description was incorrect. The

statute, as to unimproved and unenclosed land, deems possession to be in the person who pays taxes "if he have color of title thereto."

An early case involving the lumber corporation now before us cited *Southern Lumber Company* v. *Arkansas Lumber Co.*, 176 Ark. 906, 4 S. W. 2d 928. The case will be discussed, *infra*.

Effect of our decisions dealing with tax payments, where the holder of a Clerk's deed had invoked § 8920 of the Digest, is that at any time before constructive possession has given claimant the right to invoke other limitation Acts, the record owner of any land so contended for may, when the facts sustain him, cause cancellation of a void or voidable sale upon which the deed is predicated.

The right, and inferentially the duty, of a record owner to promptly contest tax payments by one claiming under color of title was mentioned by Judge McCULLOCH in *Updegraff* v. *Marked Tree Lumber Co.*, 83 Ark. 154, 103 S. W. 606. After mentioning the *Towson-Denson* case and saying that the opinion did not determine whether the full period of seven years must have elapsed before possession amounted to complete investiture of title, this statement appears: "It will be observed that the Act merely declares that the person who pays taxes . . . shall be deemed to be in possession . . . if he have color of title. The statute does not undertake to fix the period of limitation, but merely declares the continuous payment of taxes under color of title to be possession, and leaves the general statute of limitation applicable thereto. . . . It follows [that the possession] becomes complete *unless the possession be broken by adverse entry or by commencement of an action before the expiration of the seven-year period.*" This case is cited in *Slaughter* v. *Cornie Stave Co.*, 172 Ark. 952, 291 S. W. 69, where the right to bring suit and break continuity of tax payments is emphasized.

Appellee in the case at bar insists that a void deed "does not operate to give the grantee constructive possession of the land."

In *Hardie* v. *Bissell*, 80 Ark. 74, 94 S. W. 611, Mr. Justice RIDDICK, after reiterating that continuous pay-

ment of taxes under the statute was sufficient to uphold the Chancellor's finding that the plaintiff was owner of the land if the payments were under color of title, said that "If the evidence had shown that both of these parties paid taxes on this land the same year, then the first payment thereof would have been the legal payment, . . . for the Collector had no right to accept two payments." It is true that some of the language used by Judge RIDDICK was employed to explain why, in the circumstances of that case, the Supreme Court could not review certain findings of the trial Court. Nevertheless he did, as a matter of law, assert the principle contended for by appellant in the case at bar—a principle which makes the first tax payment controlling when the payer had an interest to protect, such as color of title. In effect the same conclusion was reached by Chief Justice HART in the Southern Lumber Company case, *supra*. Bradley Lumber Company, the *then* tax title claimant, had not, prior to 1911, paid taxes in a manner entitling it to invoke the Act of 1899.

Subsequently, beginning with 1911 and ending with 1925, there were two regular annual payments: one by the record title holder, the other by Bradley Lumber Co. But the record owner was first in point of time, and this payment had the effect of extinguishing the lien; "therefore," says the opinion, "in no sense could it be said that payment by Bradley Lumber Company, after the taxes had been paid by the owner of the land, gave it title to the land [under the Act]." This appears to be the general rule, as shown by decisions from other jurisdictions. See annotation in A. L. R., v. 132, pp. 216-'39.

Chief Justice McCULLOCH's opinion in *Price* v. *Greer*, 89 Ark. 300, 118 S. W. 1009, is authority for the proposition that redemption from a tax sale is not a payment within the meaning given the Act of 1899. He said: "The owner's right to discharge the tax lien at any time before sale [then the 2d Monday in June] is expressly recognized by the statute, and payment on or before that day is sufficient. The Act of March 18, 1899, prescribes no time for payment so as to bring it within these terms. It merely declares that one who pays taxes on uninclosed

and unimproved lands, under color of title, shall be deemed to be in possession thereof."

Following these statements, and in order to guide the trial Court when the case should be heard on remand, Judge McCulloch said that the statute began to run on the first tax payment, and the statute bar is complete at the end of seven years from that date, if payments are successive.

What Judge McCulloch said about the time of payment answers Bradley's argument in the instant case, that for 1924 appellant did not pay until May 8, 1925, that taxes for 1926 were not paid until April 11, 1927; that for 1927 payment was delayed until May 4, 1928; 1928 payment was made May 8, 1929; 1929 on May 12, 1930, and 1930 was paid May 5, 1931. All of these payments were before the date of sale. The fact that Burbridge did not pursue a policy of paying immediately after the permissive period refutes appellee's assertion that there was a "race" between Bradley and Burbridge, a "scramble" for first place.

Neither is there legal substance in the argument that a willingness upon Bradley's part to pay when tax receipts were prepared was the equivalent of payment. In commenting on Case No. 8606, appellee says that "On January 4, 1922, Burbridge succeeded in making the first of his eleven consecutive payments (ending with 1931). But he had paid for only three years—1921, 1922, and 1923—when Bradley as true owner also paid for seven of those 'Burbridge years,' 1924 to 1930, inclusive."

We find no authority for the Special Chancellor's conclusion that the holder of a Clerk's deed has no right to protect his constructive possession by paying a current year's taxes until the so-called "rights" of the record owner have expired through sale of the property by the Collector.

A divided Court construed the 1899 Act (Pope's Digest, § 8920) in a majority opinion by Special Judge Cohn, in 1905. *Towson* v. *Denson,* 74 Ark. 302, 86 S. W. 661. It was there said that payment under color of title for at least seven years in succession contemplates such

a constructive possession as will, after the requisite period, ripen into title by limitation. Chief Justice HILL objected to the majority's determination of what constituted *constructive* possession. His belief, as expressed in the dissenting opinion, was that when payments had been made for seven successive years, "and not until then," could possession be deemed to be of a character entitling the claimant to invoke the Act's benefits.

In permitting an appellant named Jackson to prevail over Boyd and others, who had paid taxes for thirteen years under a deed based on a void overdue tax decree, this Court, in an opinion by Chief Justice HILL, said, first, that equity would not permit a person whose duty it is to act "to wait and let the future determine whether the property is sufficiently valuable to assume burdens and rights otherwise discarded"; but, added Judge HILL, "This case is not within the Act of 1899, recently construed in *Towson* v. *Denson.*" See *Jackson* v. *Boyd,* 75 Ark. 194, 87 S. W. 126.

An applicable case closely following was *Cottonwood Lumber Company* v. *Hardin,* 78 Ark. 95, 92 S. W. 1118. Judge RIDDICK, in delivering the Court's opinion, said that he had concurred in the dissenting opinion of Chief Justice HILL in the *Towson-Denson* appeal. He then added that the construction placed upon the Act of 1899 was arrived at after full consideration, [hence,] "I feel bound thereby, for the decision became a rule of property, which should not now be overturned unless the statute, as interpreted by the Court, is unconstitutional." The Act was then held not an invasion of vested rights. In a *per curiam* opinion of November 4, 1907, our construction was affirmed by the United States Supreme Court. 207 U. S. 580-81, 28 S. Ct. 258, 52 L. Ed. 349.

The *Hardie-Bissell* case, heretofore cited, appears to have been the first judicial expression following enactment of the statute where the Court stated in express terms that the first of two contending taxpayers who satisfied the assessment had legally paid the taxes, thus discharging the State's lien.

In *Wheeler* v. *Foote,* 80 Ark. 435, 97 S. W. 447, Mrs. Foote claimed title by actual adverse possession of part

of the tract under color of title to the whole, while Wheeler contended for part of the land through payment of taxes under color of title for the requisite period of time. An acre and a half had been fenced. The Court held that Mrs. Foote's occupancy of part of the land through a tenant, under color of title to the whole, satisfied the statute's requirements, and that the adverse claimant took nothing, the Act being applicable to uninclosed land.

A case having influence upon appellee's contention (that when Bradley, though subsequent in time to Burbridge, paid taxes during some of the years necessary under the enactment of 1899 he interrupted continuity) is *Gaither* v. *Gage*, 82 Ark. 51, pp. 56-7, 100 S. W. 80. The appellant contended that payment for a portion of the statutory period while the land was unimproved and uninclosed could not be joined to actual possession for the remainder of the period, so as to give title by limitation. In disposing of this argument Judge McCulloch said: "The statute expressly declares that uninclosed and unimproved land shall be deemed to be in possession of the person who pays taxes thereon under color of title, provided he pays for seven years in succession, *and his possession begins from the first payment and continues even though he should subsequently take* [actual] *possession*." See *Miller* v. *Chicago Mill & Lumber Co.*, 140 Ark. 639, 215 S. W. 900.

Mr. Justice Kirby, speaking for the Court in *Carmical* v. *Arkansas Lumber Co.*, 105 Ark. 663, p. 668, 152 S. W. 286, said, in construing the statute in question, that failure of the true owner to pay taxes for more than seven years did not alone bar him, "but it must appear that during such period the [tax claimant] . . . previously paid the taxes thereon for at least seven years prior to institution of the suit."

Touching upon the contention respecting co-existing and adverse constructive possession, Mr. Justice Wood in *Wells* v. *Rock Island Improvement Company,* 110 Ark. 534, 162 S. W. 572, asserted that there could be no such thing, under the Act of 1899, "and the language in *Towson* v. *Denson,* 74 Ark. 302, indicating that there might

be such a case, was mere *obiter.*" After payment of taxes for seven consecutive years, there is no distinction between constructive and actual possession. This was again decided in *Smith* v. *Boynton Land & Lumber Co.,* 131 Ark. 22, 198 S. W. 107, language of the opinion writer (Mr. Justice HUMPHREYS) being: ". . . but appellee's predecessor in title having paid more than seven years' taxes on said land under color of title next preceding the date of the deed executed by appellee to appellant, the possession of said real estate rested in appellee as completely as if he had been in seven years' actual, adverse possession."

Disposing of incidental contentions made by an appellant named McFarlane, in his controversy with Morgan, 157 Ark. 97, p. 108, 248 S. W. 257, it was said: "We do not stop to consider questions raised in regard [to a designated trial Court finding], as it appears that appellee and his predecessors in title had at least color of title, and had paid the taxes for seven consecutive years, . . . and this makes a title, unless during that time the land was owned by the State."

A construction of the Act of 1899 is to be found in *Schmeltzer* v. *Scheid,* 203 Ark. 274, p. 277, 157 S. W. 2d. 193, where it was said that the *Towson-Denson* holding had been consistently followed. "The Act of 1899," says the opinion, "by its express terms, applies only to persons who pay taxes under color of title, but its obvious . . . purpose was to encourage the payment of taxes and to protect persons who pay them." The "persons" spoken of were claimants under color of title. See *Koonce* v. *Woods,* 211 Ark. 440, pp. 447-8, 201 S. W. 2d 748.

An unusual situation was presented in the appeal of *Anthony* v. *International Paper Co.,* 207 Ark. 396, 180 S. W. 2d 828, when the Paper Company, with only color of title, sought, as against the true owner, to acquire actual title by constructive adverse possession, the record owner having continuously paid taxes on the uninclosed and unimproved land each year since its purchase, or for more than seven years. It was held that "the true owner of wild and unimproved land, who has continuously paid taxes thereon from the time he ac-

quired title thereto and for more than seven years in succession, cannot be defeated of his title and right to the actual possession of his land by one who merely claims title thereto under color of title." [2]

*Effect of Tax Payments Under Color of Title.*— From the cases cited, and comments by Judges who in their opinions often spoke for an undivided Court, the pattern of construction respecting a definite purpose to be achieved under the Act of 1899 is clear and consistent. These purposes, as heretofore stated, were twofold: First, "to encourage the payment of taxes"; and, secondly, "to protect persons who pay them."

Nothing can be clearer than that the General Assembly thought that laws existing prior to promulgation of this legislation were ineffective to deal with unimproved and unenclosed lands, much of which, we know historically, had forfeited; and, *prima facie,* was owned by the State. But homeseekers and investors desiring to purchase could seldom be sure they were not buying a losing lawsuit when availing themselves of methods through which the Commonwealth had undertaken to get realty back on the tax books. So the fiction, that "unimproved and uninclosed lands shall be deemed *and held to be*" in the possession of the person who pays taxes for seven years, could have been inspired by no consideration other than to take from the delinquent record owner a defense regularly interposed—that of constructive possession. Not only, under the 1899 enactment, would such land *"be deemed"* to be in possession of the tax purchaser, but— inferentially at least—the lawmaking body intended, insofar as its constitutional powers were effective, to say that this right would in all instances be preserved; for the words "and *held* to be" give emphatic tone to the policy.

If this be true (and after the Court's divided vote in the *Towson-Denson* case all of our decisions say it is), how can we sustain the Special Chancellor's decretal finding that Burbridge, with color of title, perpetrated a wrong on Bradley by not waiting until after the Col-

---

[2] For comments on constructive possession, see Arkansas Titles, by Paul Jones, Jr., Sec. 1507, p. 913.

lector had sold the property for each successive year's delinquencies before attempting to protect the colorable right?

If the theory of continuing right is tenable, Burbridge—*after* the sale—would have been relegated to a certificate of purchase, and this would have been of doubtful value during the period of redemption. But assuming Bradley did not redeem, then Burbridge with his certificate was ultimately entitled to a Clerk's deed: Something he already had. But as to the asserted "wrong," even a foreign corporation not authorized to do business in the State could not be deprived of the presumption attaching to payment of taxes under color of title. *Rachels* v. *Stecher Cooperage Works,* 95 Ark. 6, 128 S. W. 348.

Perhaps no stronger emphasis of the legislative purpose under the Act can be found than the language employed by Mr. Justice Wood in that case. After sustaining Chancellor Martineau's holding that, under the evidence, payment by "Stecher Cooperage *Company*" disclosed a Collector's misprision, the intent having been to issue the receipt to "Stecher Cooperage Works," the opinion continued: "Such payment under the conditions prescribed by [the Act of 1899] gave [the Cooperage Works] not *prima facie,* but perfect title, and the Court was correct in so holding." Again Judge Wood said: "The payment of taxes under the conditions prescribed . . . *starts the limitation contained* therein against the owner. If the taxes are paid . . . seven years in succession *at any time when taxes are payable,* the party paying acquires the title, whether he makes the payments within one year of each other or not"; for the "wrong" done the record owner could have been circumvented by timely proceedings, taken before investiture of title became absolute by limitation. *Sibly* v. *England,* 90 Ark. 420, 119 S. W. 820.

*Filing "List" With Collector—"Offer" to Pay Taxes.*—Appellee insists that when it filed a list of its properties, and through agent expressed a purpose to pay when the Collector, at his convenience, could prepare receipts, the willingness created equitable rights equiv-

alent to actual payments. The principle was discussed in *Kitchens* v. *Machen,* 210 Ark. 1046, 198 S. W. 2d 833, with citation to cases holding that an attempt to pay, made in good faith by owner or agent, *"and frustrated by acts of the party entitled to perform, or through negligence of the official whose duty it is to render the service,"* entitles such person to do at a later date what he honestly thought was being done when the misleading official conduct occurred.

In the *Kitchens-Machen* case we held that the appellee's omission was not induced by the Clerk's conduct, and reversed the judgment with directions to set aside the order cancelling a State deed.

The case at bar does not establish facts persuasive of the proposition that Reaves, as Bradley's agent, intended to pay the Company's taxes when the property list was filed. On the contrary the evidence discloses a course of conduct engaged in by many large taxpayers. It involves mutual accommodations and reciprocal courtesies, but "standing by," with an attitude of willingness while impliedly consenting to wait, is not "tantamount to payment," for the receipt was actually delivered under conditions and in circumstances contemplated by the parties when the list was filed. See *Gilley* v. *Southern Corporation,* 194 Ark. 1134, 110 S. W. 2d 509; *Redfern* v. *Dalton,* 201 Ark. 359, 144 S. W. 2d 713; *Holt* v. *Reagan,* 201 Ark. 1101, 148 S. W. 2d 155.

Contending that because he had paid taxes for six consecutive years under color of title, and in the circumstances was entitled to make the seventh payment, the plaintiff in *McCastlain* v. *Wylie,* 139 Ark. 326, 213 S. W. 743, sought through injunction to prevent the record owner's payment from becoming effective. Facts were that on the first Monday in January, 1919, Wylie tried to pay. The books were not at that time in the Collector's office. The following day he again applied and tendered the correct amount, but was informed that McCastlain as record owner had discharged the obligation on the first day of January, and that the tax books disclosed this status. Wylie claimed the early payment was a fraud on his "rights," in that it was made prior to the time fixed

by law for such payment. At that time legal payment began on the first Monday in January and ended with the close of business April 10th.

The decision, after stating that a demurrer to the answer admitted McCastlain was the true owner, and as such was the only person who had the legal right to pay "upon issue joined on that question," said: "While appellee is not a mere volunteer, he has no such interest in or title to the land as to give him a preferential right over the true owner, . . . The tax book had been marked paid, and no taxes for 1918 were charged against the land when the suit was brought."

Under the rule laid down in *Kitchens* v. *Machen,* constructive (if not actual) notice that Burbridge was claiming the property contended for in appeal No. 8607 was received. This is not a legal prerequisite to the tax-title claimant's right to protect his color of title, but it does underscore the record owner's negligence in failing to act when some of the receipts issued to him showed that taxes had been paid by Burbridge for certain years.

This brings us to a consideration of relative rights between the two claimants and the effect to be given first payment.

Until the requisite consecutive payments have been made, the tax-title claimant has nothing but color of title with presumption of possession. Each successive payment merely brings him that much closer to the time an investiture of title may be asserted under the seven-year limitation statute. In the meantime, assuming there is but one controversy and that the sale was voidable, the owner is protected as against the State and others, for the land cannot again be sold. The lien has been discharged by the tax-title claimant. *Hardie* v. *Bissell, supra.*

*The Description, "Frl. SE¼ R.B.R."*—Bradley Lumber Company had consistently used this and similar abbreviations to designate the area in controversy and other lands. But the Company now insists it is meaningless, or at least too ambiguous to be used as the basis for title. In *Rhodes* v. *Covington,* 69 Ark. 357, 63 S. W. 799,

the Court held in an opinion written by Mr. Justice BATTLE that a tax deed which described the land as "L.B.R.W. Pt.," etc., was void for want of certainty. But in reaching this determination it was said: "Assuming that 'L.B.R.' means left bank of river, who, ignorant of the land intended, would know what 'W. Pt.' meant?"

Two comparatively recent cases (one decided in 1940, the other in 1941) reviewed decisions dealing with uncertain descriptions: *Mosely* v. *Moon,* 201 Ark. 164, 144 S. W. 2d 1089, and *Toler* v. *Fischer and Holmes,* 201 Ark. 1107, 148 S. W. 2d 159. In the first appeal the description was "N of RR Frl. SE¼," etc., "25.88 acres." These were held bad; but, in the Toler-Fischer-Holmes case, quoting from *Schattler* v. *Cassinelli,* 56 Ark. 172, 19 S. W. 746, this paragraph appears: "In special statutory proceedings to enforce tax charges against lands, the abbreviations employed must have been in such general use and knowledge in reference to government surveys that the meaning thereof will be intelligible, not only to experts, but also to persons with ordinary knowledge of such matters."

The requirement that lands be assessed with reasonable certainty and advertised in the same manner has a twofold purpose. First, the taxpayer must know how and why and for what he is charged; and, secondly, he may reasonably rely upon statutory land-sale advertisements to determine whether, through error, he has failed to pay upon designated holdings.

Whether a particular taxpayer has been misled through use of arbitrary abbreviations by the taxing authorities depends upon what an ordinary, unskilled person would be expected to understand. We have judicial knowledge that in government surveys the left bank of a river means the bank corresponding with the left side of a person who is proceeding downstream; and the right bank is determined in like manner. We also know that government tract books and surveyors' field notes abound with the designations "L. B. R.," and "R. B. R.," and that no question of uncertainty arises where land and water proximities are such that reasonable, unskilled

persons must of necessity know what was intended. If it be urged (something that is not the law) that actual knowledge is essential, Bradley, in the instant appeal, had this information; for, as has been stated, the Company listed some of its property in the exact manner now complained of. Rivers, especially navigable streams, are less transient than public roads or man-made markers; hence we are not impressed with appellee's asserted confusion.

*Area Involved and Acreage Mentioned in Deed.*— Appellee insists that when Burbridge paid taxes from 1921 to 1935 on "some" 132 acres variously described as "Frl. SE¼ RBR," "Frl. SE¼ R. B. R.," or "RBR Frl. SE¼," or "R.B.R. Frl. SE¼" of Section Twenty-three, etc., the land was "somewhere in the Southeast Quarter," but not definitely placed. The distinction between the first and second descriptions appears to be that in one case periods were used between the abbreviations for Right Bank of River, while in the other case they were not; also "Frl." appears before the abbreviations once, and following them in the second case. This is trivial, and is in no sense justification for the assertion that because each litigant made use of compressed descriptions, neither should be regarded as having paid taxes on any land. Emphasizing this point, appellee gives as an illustration the assessment for 1927 when Burbridge paid on "RBR Frl. SE¼, 132 acres." Bradley paid on "RBR SE¼ 118.02 acres," while J. R. Wilson paid on "LBR E½ SE¼, 13.50 acres."

It will be noted that, insofar as acreage is to be considered, Burbridge paid on more than Bradley and Wilson combined; and, under the rule that the greater may include the lesser, it does not follow that Burbridge failed to pay upon all the land he claimed, or all that was covered by his Clerk's deed.

Argument similar to appellee's contention was advanced in the Koonce-Woods controversy, already cited. In that case decisions, emphasizing that acreage was not controlling, were cited. It was held that Koonce took all of the area within the fractional description; or, rather, the deed was *prima facie* evidence of such ownership.

In *Towell* v. *Etter,* 69 Ark. 34, 63 S. W. 53, Thompson had bought the Southwest Quarter of Section Thirteen, etc., containing 151 acres. Accretions had added 35 acres to the tract. In the original opinion Mr. Justice HUGHES held that title did not pass. On rehearing, however, he quoted from the opinion of Mr. Justice BREWER in *East Omaha Land Company* v. *Jeffries,* 34 F. 386, (affirmed, *Jeffries* v. *East Omaha Land Co.,* 134 U. S. 178, 10 S. Ct. 518, 33 L. Ed. 872) :—''The fact that the deed to Thompson is for the SW¼ 13, 151 acres, does not limit his purchase to that number of acres. Where land is otherwise properly described and so designated as to lead the owner to acknowledge that it is his land, a mistake in the number of acres is immaterial.''

The rule that acreage does not control is too well established to admit of controversy now. See *Perry* v. *Sadler,* 76 Ark. 43, 88 S. W. 832, where the *Towell-Etter* decision was cited; *Little* v. *Williams,* 88 Ark. 37, 113 S. W. 340, where Mr. Justice McCULLOCH said that Courts take judicial cognizance of the general system of Government surveys; *Chapman & Dewey Lumber Co.* v. *St. Francis Levee District,* 100 Ark. 94, 139 S. W. 625, reversed by Supreme Court of United States, 34 S. Ct. 297, 58 L. Ed. 564, 232 U. S. 186; *Alphin* v. *Banks,* 193 Ark. 563, 102 S. W. 2d 558. Appellee cites *Sanders* v. *Plant,* 211 Ark. 913, 204 S. W. 2d 323. That case is not in point. The accretions had been severed from the platted lands for the purpose of taxes.

It follows from what has been said that the decree in each case must be reversed, with directions to quiet title in Burbridge. Cause No. 8607 is remanded for further proceedings to determine appellant's rights under his allegation that timber was wrongfully cut.

Justices FRANK G. SMITH, McFADDIN and MILLWEE concur in case No. 8607.

ED. F. McFADDIN, Justice (concurring). I agree with the opinion in case No. 8606; and concur in the result reached in case No. 8607. I cannot agree with some of the statements contained in the majority opinion in case No. 8607, which statements I regard as erroneous

*dicta;* and the purpose of this concurrence is to register my views in that regard.

In the latter portion of the opinion there is a paragraph beginning with these italicized words, *"The Description, Frl. SE¼ R. B. R."*; and later there is another paragraph beginning with these italicized words, *"Area Involved and Acreage Mentioned in Deed."* My concurrence has reference to those two paragraphs and the three intervening paragraphs. First, I will discuss the contents of these paragraphs as being (1) erroneous, and then I will discuss the contents as being (2) *dicta.*

I. *Erroneous.* The majority say: "We also know that government tract books and surveyors' field notes abound with the designations 'L.B.R.', and 'R.B.R.', and that no question of uncertainty arises where land and water proximities are such that reasonable, unskilled persons must of necessity know what was intended."

I seriously question the above statement, and venture the assertion that a majority of the lawyers and real estate men in Arkansas would never surmise that "L.B.R." meant "left bank of the river." It might just as well mean "lumber." A person may search all of the library dictionaries, law dictionaries, encyclopedias and law texts, including *Corpus Juris,* American Jurisprudence and Words and Phrases, and will not find "L.B. R." listed as uniformly meaning "left bank of the river," and "R.B.R." as uniformly meaning right bank of the river." I maintain that the letters "L.B.R." and "R. B.R." have no such generally recognized meaning as that ascribed by the majority.[1]

Furthermore, I think the majority opinion is at fatal variance with our holding in the case of *Toler* v. *Fischer and Holmes,* 201 Ark. 1107, 148 S. W. 2d 159, where we said: "Because of this inadequate and void description, the court below lacked the power to sell these lands for the road district taxes assessed against them. The lands

---

[1] In *Wilkerson* v. *Johnston,* 211 Ark. 170, 200 S. W. 2d 87, we quoted the long established rule: "A description which is intelligible only to persons possessing more than the average intelligence, or the use and understanding of which is confined to the locality in which the land lies, is not sufficient."

were assessed, advertised, sold and confirmed under the following description: 'R.B.R. S.E. Quarter of S.W. Quarter, Section 25, Twp. 18, R. 2 W. 25.88 acres,' which, as indicated, was inadequate and void.''

If ''R.B.R.'' was inadequate and void in *Toler* v. *Fisher,* then I cannot see how ''R.B.R.'' should suddenly become a good and sufficient description in the case at bar.

In *Simms* v. *Rolfe,* 177 Ark. 52, 5 S. W. 2d 718, the description of the property sold at the tax sale was: ''W of R NE¼, Sec. 8, Twp. 5 North, range 4 east''; and we held the sale void ''for lack of a legal description.'' We said: ''The letter 'R' or 'r' in the description before us could as well refer to ridge or road as river, or any natural or artificial monument, . . .'' Likewise, in both appeals in *Brinkley* v. *Halliburton,* 129 Ark. 334, 196 S. W. 118, 1 A. L. R. 1225, and 135 Ark. 592, 204 S. W. 213, we held as bad this description: ''N of RR. Frl. SW¼, Sec. 26, T. 6 N., R. 7 E, 125 acres.''

We said in both appeals: ''The abbreviation 'RR' is not an abbreviation commonly used to designate government subdivisions. Government surveys were not made with reference to railroads. The abbreviation 'RR' does not necessarily convey the meaning of railroad to one of only ordinary experience in land titles . . . the letters could have reference to Ridge Road or River Road. It might refer to any natural or artificial monument where such letters were used in spelling the monument in mind.''

As with ''R'' in *Simms* v. *Rolfe,* and as with ''RR'' in *Halliburton* v. *Brinkley,* so with ''L.B.R.'' and ''R.B. R.'' in the case at bar: the letters might stand for a variety of meanings, and thus do not mean one definite tract of land, which is the essential requirement in tax descriptions. In short, I consider as erroneous all that portion of the majority opinion which says that ''L.B. R.'' and ''R.B.R.'' are definite terms descriptive of land in tax proceedings.

II. *Dicta.* But the foregoing error is *dicta* in this case, where tax payments are concerned, rather than a

tax sale. In the case at bar the land was legally described in the tax sale and tax deed to Burbridge as: "Fractional Southeast Quarter, Sec. 23, Twp. 12 S, R 9 W, 132 acres."

This was a good, sufficient and legal description, and in this respect, the case at bar is different from those previously cited in this concurring opinion. Furthermore, Burbridge, holding under such deed, paid the taxes for more than 7 consecutive years on *all* of the land in the fractional southeast quarter of said section 23. In these tax receipts the collector described the lands as "Frl. SE¼ R.B.R. Sec. 23" or "R.B.R. Frl. SE¼, Sec. 23." In 2 C. J. 209, in discussing effect of misdescription in tax receipts, this statement appears: "One who, under color of title acquired in good faith, has paid the taxes actually assessed against land is entitled to the benefit of the statute, notwithstanding the land may have been misdescribed in the tax receipts, provided he is able to remove the uncertainty by extrinsic evidence."

And in 2 C. J. S. 749 this statement appears: ". . . if claimant pays the taxes on the land actually claimed, the fact that the land was misdescribed in the assessment or in the tax receipts is immaterial."

In the case at bar Burbridge—for more than 7 years —paid the taxes on *all* of the lands in the frl. SE¼ of Sec. 23, and such description appears on the tax receipts (which fact distinguishes this case from *Boynton* v. *Ashabranner,* 75 Ark. 415, 88 S. W. 566, 1011, 91 S. W. 20; but in Burbridge's receipts there were the letters "R.B.R.", as previously mentioned. Since these letters are meaningless—as previously stated—we may disregard them as surplusage; and the result is that Burbridge held under a tax sale and deed validly and legally describing the land, and for more than 7 years paid the taxes on *all* of the lands in the Frl. SE¼ of said Sec. 23. The result is, that he is entitled to the benefits of § 8920, Pope's Digest.

Therefore, I concur in the result reached by the majority in case No. 8607, because I consider the statements in the majority opinion about "R.B.R." and "L.B.R."

to be *dicta,* and I am authorized to state that Mr. Justice Frank G. Smith and Mr. Justice Minor W. Millwee join me in this concurrence.