BUCKNER v. SEWELL.

4-8984                                          225 S. W. 2d 525

Opinion delivered December 5, 1949.
Rehearing denied January 23, 1950.

*Bernard Whetstone,* for appellant.

*Mahony & Yocum, C. E. Wright* and *Neill C. Marsh, Jr.,* for appellee.

GRIFFIN SMITH, Chief Justice. Forty acres, wild and unimproved in 1927 and for many years thereafter, were included in Joe Buckner's trust deed to N. C. Marsh, executed December 23, 1927, securing a note for $250 payable to J. W. Edwards. At that time the land was assessed for $120, but appraisers certified that it was worth $4 per acre in 1931. Oil discoveries in the Cairo area (Shuler Field) of Union County—two-thirds of a mile from the property Buckner conveyed in the trust deed—have given the tract a lease value of from $500 to $1,000 per acre, and a royalty value of $1,000 per acre.

In September, 1948, Buckner alleged in his equitable proceeding that Edwards sold the note and assigned the trust deed to H. P. Sewell, who on March 7, 1931, undertook to foreclose under power contained in the deed, with Sewell as purchaser for $107. Insistence is that the sale was void, hence Sewell is a mortgagee in possession, and as such must account for rents and profits. The appeal is from a decree dismissing for want of equity. Buckner asserts (a) that the Court abused its discretion in forcing a trial prematurely; (b) the several foreclosure irregularities complained of rendered the sale void; (c) the mortgagor was so obviously weakminded as to require the solicitude of equity and a determination, under the facts disclosed, that mental insufficiency occasioned delay in adopting a remedy, hence *laches* ought not to be invoked; (d) where a sale is void, limitation statutes cannot be pleaded against the mortgagor — particularly where there is mental deficiency.

*Sequence of Transactions After 1927.*—In February, 1929, Buckner evidenced his indebtedness to Edwards by a note for $318, secured by deed of trust on personal property. Similarly, an indebtedness of $269.80 was secured in 1930. Livestock and the crop Buckner expected to produce in 1928 were included in the 1927 deed, but neither, as security, enters into the litigation here. Buckner's action in paying Sewell $30 for three or four of the cows described in the foreclosure is urged as conduct indicating acquiescence in the procedure.

In 1937 Sewell and his wife delivered to Neil C. Marsh, Sr., and Neil C. Marsh, Jr., their warranty deed to an undivided 1/128th interest in the oil, gas, and other minerals, subject to a lease executed by the Sewells in 1935 to Lion Oil Company. In February, 1944, Carter Oil Company procured from the Sewells an oil and gas lease, with warranty, the consideration being $300. In October of the same year Marsh and his son leased to Carter Oil Company.

*First*—(*a*)—*Premature Trial.*—In a petition filed October 22, 1948, in consequence of the complaint of September 20th, the Carter Company mentioned its mineral leases and asked that the plaintiffs' cause be set for early trial, *lis pendens* having been filed with the complaint. Carter expressed fear that undue delay in adjudicating the claims would prove costly. The record discloses that when Carter asked for consideration of the motion its answer had been filed. Sewell and the Marshes had also answered, while Ida Edwards, wife of J. W., had entered a disclaimer of interest.

Carter's counsel, when the petition was filed—or during the same day—called it to the Court's attention while appellants' attorney was present. The Chancellor found that issues had been joined, and favored expeditious consideration, but permitted Buckner and his wife to amend from time to time as circumstances might warrant. Trial was set for November 16.

November 5th the plaintiffs filed a 36-page complaint amendment. Other pleadings followed, including a stipulation that Carter Oil Company had settled with

Buckner, and that as to the Oil Company there should be dismissal with prejudice. Although the plaintiffs had (October 22) excepted to the order advancing the cause, they appeared November 16th, and without renewing the motion asked assistance of a procedural nature, including a request that a substitute trustee be named. The present contention is that necessity for an early hearing terminated when the Carter Company was eliminated.

By amendatory Act of 1929, Ark. Stats., (1947), § 27-1719, Chancery Courts are given a broader discretion in arranging their dockets; and, subject to the statutory limitations, the 90-day period for pleadings may be reduced. The dominant consideration is whether issues have been joined. The 1929 amendment was discussed in an opinion written by Mr. Justice McHANEY, *Sisk* v. *Becker Roofing Co.*, 183 Ark. 101, 34 S. W. 2d 1078, who expressed the Court's construction that Act 37 was intended to eliminate delay, and to make it possible for either party "to get a trial without waiting 90 days after issue joined". See *Burks* v. *Cantley,* 191 Ark. 347, 86 S. W. 2d 34; *McMorella* v. *Greer,* 211 Ark. 417, 200 S. W. 2d 974.

Counsel for appellant think (1) that because records incidental to actions of the trustee who in 1931 foreclosed the 1927 trust deed were not found until a few days before trial, and (2) that without appreciable aid from an incompetent client, and (3) that due to other factors—such as an opportunity to study transactions covering more than 20 years—and (4) that owing to extreme poverty of Buckner as contrasted with the alleged financial sufficiency of defending parties, denial of the full 90 days was an abuse of discretion.

Our conclusion is that the Chancellor, as an original undertaking, was in a superior position to pass upon these matters, and that the burden of showing prejudicial results has not been met. There is a presumption that when litigation has been started those activating it have fortified themselves in respect of essential facts. In the case at bar the utmost diligence is disclosed. Exhaustive investigations are reflected in careful and compre-

hensive pleadings. At no time did the Court act oppressively. On the contrary the record affirms a painstaking course impartially pursued; hence the suggestion of undue haste is without force.

*Second—(b)—Validity of the Foreclosure.*—Seven reasons are grouped to support the claim that title did not pass under the trustee's deed: (1) It was improper to sell the realty without mentioning two subsequent deeds covering personal property; (2) illegal charges treated as "costs" and "services" were included; (3) personal property in the 1927 deed was not exhibited at the sale; (4) cash was demanded, whereas the advertisement called for a credit of three months; (5) the loan was usurious; (6) there was want of due process; (7) the notice of sale was insufficient.

Appellees concede that unauthorized costs of $1.50 were added, and that an overplus of 78c may have been wrongfully applied, but they insist that the total of $2.28 is *de minimus* and could not invalidate the deed. Since our disposition of the case does not require consideration of the items complained of, their materiality and force in different circumstances are neither affirmed nor rejected.

*Third—(c)—Buckner's Mental Status.*—Appellants' amendment to their complaint alleges that Joe Buckner, a Negro 67 years of age at the time of trial, was then and had always been patently inferior mentally. This abnormality, they say, prevented him from understanding the meaning of things he was asked to sign, particularly in relation to time and figures. So handicapped, he did not know that more than one trust deed had been executed, nor did he comprehend "that he was financed [by Edwards] for more than two years, [and this is true] in spite of record evidence presented herein". The charge of weakmindedness was made by Bernard Whetstone as solicitor, "and in the additional capacity of *amicus curiae,* and by way of explanation of the delay in offering the information contained in the amendment to the complaint."

Buckner testified that he had never been seriously ill—had only suffered occasionally from headaches and had sustained a rupture; no "tainted blood" or anything of that kind. The land in question was inherited from his father. In an attempt to show mental weakness, counsel caused appellant to explain that a house he had built as a home was erroneously located on property not within the 40-acre tract. Appellant could not name the countries "on our side" in the last World War, but "thought he remembered hearing it talked that there was another war about twenty or thirty years ago". He did not know what countries were on our side at that time. He knew that in a mortgage "they take your stuff, all you own". When asked how old he was fifty years ago, the witness replied that he would have to count it up. He could count money, but sometimes got mixed up a little, and needed glasses when counting. Counsel for appellant put money before Buckner and asked him to count it in the Court's presence. It was stated (for the record) that the units were one fifty dollar bill, two tens, a five, four ones, a 50c coin, a quarter, two dimes, and four pennies. Buckner made an error of $1, counting the displayed money as $100.99 instead of $99.99. He could read a little, but did not consider himself educated. As a boy he had gotten but slight training, not beyond the third reader, but could write and sign his name. Can read a little from the Bible, and otherwise.

Margaret E. Fitch, testifying before the Court, discussed a test she said was given Buckner October 27, 1948, (without appellees' knowledge) to determine his intelligence quotient. Mrs. Fitch, as a psychologist, holds a Ph. D. degree from Cornell. Between 1937 and 1945 she served with the Psychological Corporation of New York City. At the request of industrial employers, general mental inquiries known as the Revised Beta Tests were given in order to make job classifications. The test was usually taken by ignorant English-speaking people, mostly adults. When the tests were applied to Buckner, he scored 19 of a possible 123 points. Mrs.

Fitch thought that the experiments, taken as a whole, placed the subject in an 11½-year age group.

While the Chancellor did not by any express language find that Buckner was mentally capable of transacting business, this is the effect of the decree. Litigation would be endless and transactions insecure if courts were permitted to balance the business finesse, trading experience, literary aptitude, and such other factors against or in favor of persons whose transactions are subject to judicial review, and then by merely finding that one was smarter than the other, adjudge that a transaction was inequitable and therefore unconscionable. It is only where the degree of mental insufficiency disables the complaining person "from appreciating the invasion of his rights or prevents him from seeking relief from the wrong" that equity will exercise its jurisdiction. Compare the facts here with *McIntire* v. *Pryor*, 173 U. S. 38, 19 S. Ct. 352, 43 L. Ed. 606; *Wright* v. *Fisher*, 65 Mich. 275, 32 N. W. 605, 8 Am. St. Rep. 886.

In the case at bar the trial Court had a right to consider the appellant Buckner's actions and his condition in 1927 when he asked Edwards, another Negro, to advance money for use in making a crop. Edwards was hesitant in taking legal action. For personal reasons he assigned the trust deed and sold the note to Sewell. His version of discussions with Buckner was before the Chancellor, as were other acts indicating an understanding by appellant of what he was doing and why he delayed in testing a remedy. Buckner admitted attending the sale in El Dorado, but says he didn't know he had a right to bid. This explanation was contradicted by appellant's admission that he talked with some one who told him the sale was being conducted by the trustee, and that he went to borrow money for use in bidding. Upon returning half an hour later he "didn't see anybody at all".

Appellant also stated that while the property was being auctioned he listened the best he could, "but my mind was so ramshacked that I couldn't hold anything in it". When asked whether, at the time, he knew what

was being done, the reply was, "Well, not altogether". He just went ahead in the hope that he could get his land back some day. Later Buckner went to Sewell and asked what he (Buckner) would have to do to get his cows back. Sewell told him $30 would be required, "so I went back to the man I was staying with and got the money and went and got the cows". Later he asked Sewell about redeeming the land, "and was told it would take a thousand dollars".

Buckner admitted that he "made a contract with Judge A. D. Pope to get the land back". The record shows that Pope's complaint named Sewell, Edwards, and Marsh as defendants. *Lis pendens* was filed March 22, 1937. The complaint asked cancellation of the trustee's deed of March 20, 1932. Other conduct of Buckner, when considered with things that have been mentioned, was sufficient to sustain a finding that, while Buckner's knowledge was no doubt confined to mere familiarity with the rudiments of such business transactions, the deficiency went more to his intelligence than it did to strict mentality incapacity.

Approval of the strict rule asked by appellant's counsel would pose difficulties not heretofore thought justified. *Beaty* v. *Swift,* 123 Ark. 166, 184 S. W. 442, is pertinent. The Court's opinion by Mr. Justice Frank G. Smith holds that an ignorant and illiterate person may acquire property and may convey it, "provided he knows what he is doing and understands and appreciates the transaction in which he is engaged".

An 87-year-old man's capacity to execute a mineral deed was questioned when heirs of W. L. Johnson alleged that he was senile, weak in body and mind, and otherwise deficient when the transaction occurred in 1937. In sustaining the Chancellor our opinion, *Johnson* v. *Foster,* 201 Ark. 518, 146 S. W. 2d 681, cites cases holding that if the maker of a deed, will, or other instrument, possesses sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, to whom it is to go, and upon what

consideration, then it may be upheld. Almost identical language is in many of the opinions of this and other courts. *Walsh* v. *Fairhead, Executor,* 215 Ark. 218, 219 S. W. 2d 941.

*Fourth*—(*d*)—*Limitation Statutes.*—In his finding of facts and declarations of law Judge HAYNIE ascertained that about $100 was due on the Buckner-to-Edwards note when the trust deed was foreclosed. Irregularities occurred in making the sale, and collateral proceedings incident to the foreclosure should not be condoned. But, said the Chancellor, the action taken in 1937 had as an objective the same result as that sought in 1948. Buckner's admission that he "employed" Pope is highly persuasive of the plaintiff's understanding that Sewell claimed the property under any construction, and it cannot be said that when the suit was being prepared Buckner was ignorant of his attorney's purpose; nor could he have believed that Sewell was not notoriously hostile to the relationship now sought. Buckner's 1937 suit had been set for trial June 14. With dismissal for want of prosecution went judgment against the plaintiffs for cost; and Buckner, if mentally competent, could not thereafter be heard to say he did not think Sewell was claiming adversely.

Appellees now concede that their plea of *res judicata,* based upon dismissal, cannot be sustained, but they emphasize essential facts attending the transaction as fixing a point of time from which limitation statutes could be pleaded.

*Fifth*—*Tax Payments*—*Laches*—*Estoppel.*—A trustee's deed, whether valid, void, or voidable, is color of title unless facts in avoidance appear on the face of the instrument. Sewell paid taxes under the deed for sixteen consecutive years, and he also paid for 1930 and 1931. In respect of the first payments Buckner testified that after the sale he "went to see about them, . . . and the man told me they had been paid". After that he let "Mr. Horace (presumptively Horace P. Sewell) make the payments". When asked if he "just walked off the land and left it, and didn't pay any

attention to it for seventeen years", Buckner replied, "I was studying about it: it was on my mind".

Although Act 66 of 1899, Ark. Stats., (1947), § 37-102, was a legislative design to encourage tax payments "and to protect persons who pay them", *Schmeltzer* v. *Scheid*, 203 Ark. 274, 157 S. W. 2d 193,[1] rights acquired through tax payments are not restricted to ·instances where the sale was made by collecting authorities. In *Towson* v. *Denson*, 74 Ark. 302, 86 S. W. 661, it was said that payment of taxes on unimproved and unenclosed land under color of title for seven years, if consecutive, "constitutes an investiture of title". See, also, *Koonce* v. *Woods*, 211 Ark. 440, 201 S. W. 2d 748. Cases dealing with tax payments are collected in *Burbridge* v. *Bradley Lumber Company*, 214 Ark. 135, 215 S. W. 2d 710. All are to the effect that an investiture follows such payments when all statutory requirements are met, and that the title so acquired is fee simple.

What, then, of Sewell's tax payments for more than seven years after appellants, through notice in a judicial proceeding, had been informed that the deed-holder claimed to be the owner? The Sewells, as defendants in 1937, formally asserted that the sale was valid. They also alleged possession, and detailed their reasons for believing title was good. If in support of appellants' argument, it should be conceded that irregularities attending the sale rendered it voidable—creating the relationship of mortgagor with the mortgagee in possession from 1931 until 1937—certainly during the succeeding eleven years appellants were under no misgivings regarding adverse claims, and the maxim "Once a mortgage, always a mortgage", is without compelling force.

The opinion in *McFarland* v. *Miller*, 211 Ark. 962, 203 S. W. 2d 404, discusses the general rule that the purchaser at a *void* foreclosure sale is presumed to hold as mortgagee in possession; but it is also said that this principle does not apply where the purchaser takes pos-

---

[1] The Schmeltzer-Scheid opinion, p. 276, says that "Legislation of this character had its inception in this state in the passage of Act 65 of the Acts of 1899, p. 117." The Act number is 66, and "65" is clearly a typographical error.

session as owner, and where the facts are such that the mortgagor, or owner of the equity of redemption, must have known that the purchaser was holding adversely. The opinion quotes from *Norris* v. *Scroggins,* 175 Ark. 50, 297 S. W. 1022. Mr. Justice Wood, speaking for the Court, cited with approval an excerpt from Jones on Mortgages, 2nd Ed., and stressed the statement that the statute of limitation does not begin to run against the right of redemption "until actual notice is given such owner by the party in possession . . . that he claims to hold in some other right than that of mortgagee or assignee of the mortgage, or he clearly makes it known by his acts that he holds adverse to the mortgage".

Whether changes during the eighteen-year period—such as death of the trustee in 1942, death of Edwards, to whom the original note was given, the death long ago of one of the appraisers, imperfect recollection of the two surviving appraisers and of the Justice of the Peace who appointed them—whether these things worked an estoppel against Buckner we do not determine. What we do decide is that with dismissal of the 1937 suit Buckner very definitely knew that Sewell intended to resist all attempts to recapture the property. This conduct of continuing inactivity justified Sewell in relaxing any vigilance he otherwise might have shown. The decree could be upheld under the seven-year statute of limitation, or because of *laches.*

Affirmed.